**IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Criminal Action |
| | ) | No. 06-05018-01/02-CR-SW-RED |
| MARZETT L. PARKER and | ) | |
| ODELL M. EDWARDS, | ) | |
| | ) | |
| Defendants. | ) | |

### REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE

Pursuant to 28 U.S.C. § 636(b), the above-styled criminal action was referred to the undersigned for preliminary review. This matter comes before the Court on defendants' Motion to Suppress Evidence. A hearing was held before the undersigned on July 18, 2007. Defendant Parker was represented by Stacie Bilyeu, and defendant Edwards was represented by Ann Koszuth. The government was represented by Randall Eggert, Assistant United States Attorney.

Defendants move the Court to suppress any evidence in this case, and any statements obtained by law enforcement officers as a result of the March 30, 2006, detention, seizure, arrest and search at the weigh station on I-44 in Newton County, Missouri, as well as the search and seizure pursuant to the subsequent search warrant issued by the undersigned on April 4, 2006. It is their contention that the commercial vehicle was allegedly stopped for a routine compliance check by the Missouri State Highway Patrol Commercial Motor Vehicle Officers, and that they were not cited for failure to comply with the subject matter of that compliance check. Defendants contend that the

1

officers detained them for six hours, which was beyond the scope of their authority and was without reasonable suspicion or probable cause. They assert that the officers obtained consent to search only after the unlawful detention, and that the consent was therefore not voluntary. It is also their contention that they were in custody, but were not read their <u>Miranda</u> rights.

The government responds that the officers conducted a routine traffic stop on a commercial vehicle to ensure that the truck and driver were in compliance with applicable state and federal laws. Because commercial trucking is a closely regulated industry, and because the North American Standard Inspection Procedure provides adequate notice to truckers and limits the officers' discretion, it is asserted that probable cause is not needed to stop a commercial vehicle for inspection. The officers' stop in this case and the inspection did not conflict, therefore, with the constitutional requirements of a valid regulatory stop. The government also asserts that the officers had reasonable suspicion to detain the occupants of the vehicle while they contacted the Missouri State Highway Patrol after they noted discrepancies in the logbooks and in the stories provided by defendants, and noticed cardboard boxes in a vehicle allegedly being taken to an auction. It is contended that this was like a routine traffic stop, during which the law allows them to detain a vehicle, check for license and registration, and ask further questions if their suspicions are aroused. The government asserts that the time between the stop and defendants' arrest was not unreasonable, under the circumstances. Finally, the government contends that defendant Parker voluntarily gave consent for the search of the vehicle. Once they had valid consent, and upon discovery of the contraband, it is asserted that the officers had probable cause to believe the vehicle contained objects subject to seizure, which was confirmed by the use of a trained canine who positively alerted to the presence of a controlled substance before the officers opened the cans.

2

The first witness for the government was Ted Wilkins, a Missouri State Highway Patrol Commercial Motor Vehicle Officer. He testified that his enforcement powers stem from the Commercial Vehicle Safety Alliance to enforce federal motor vehicle safety regulations. Pursuant to Missouri statutes, he is empowered to use those regulations. On the 30th of March, 2006, he was working at a mobile scale unit close to the Oklahoma border. Defendants' vehicle came across the scale to be weighed, and he asked that they come around so he could check their paperwork. He routinely stops commercial motor vehicles as part of his job to check for compliance with federal and state regulations, and to check credentials, logbooks, licenses, and insurance cards. He is also allowed to do random checks to ensure that the paperwork is in order. He is familiar with the North American Standards for inspection of motor vehicles, and in this case, conducted a Level I inspection. This includes checking the license, logbooks, where the vehicle has been and where it is going, medical cards, fuel level, and licenses. When he contacted defendants, he asked defendant Parker for his paperwork, as he was the driver. He was driving a car hauler, and the officer saw three or four vehicles on the hauler. Defendant Parker gave him the documentation he asked for. This included the authority to haul the load, the logbook, licenses, bills of lading, and just general paperwork. Defendant had a current International Fuel Tax Agreement ["IFTA"]. He also had a single state license, which was his authority to haul a commercial load, but this was expired. Officer Wilkins decided, at that point, to conduct a walk-around inspection, which is a Level II inspection. This involves a general visual inspection of the vehicle, including checking the lights, tires, and other mechanical things. In the logbook, Officer Wilkins was concerned because the last entry was on the 28th, and this was the 30th. Because the logbook was not up-to-date, it did not comply with regulatory standards. The officer was therefore required, under the law, to place the

3

driver out of service for ten hours, under the North American Standards. He made copies of the log sheets and asked if he had a co-driver. Defendant Parker identified that individual to be co-defendant Edwards. Officer Wilkins told defendant Parker to update his logbook and to get defendant Edwards' license and logbook. The officer talked about the inspection with his supervisor. In addition to the logbook not being up-to-date, the officer noted other things that caused him to be suspicious: Defendant Parker had loaded the hauled vehicles seven or eight days before this. The officer saw the bills of lading for hauling those vehicles. According to them, he was hauling a Chevrolet pickup, Ford Excursion, and Nissan Van. He had picked these vehicles up on the 14th, and the 20th, and had left California on the 28th at 9:30 p.m. When he was talking to defendant Parker, he kept saying that he needed to get the vehicles delivered in a hurry. When the officer reviewed the logbook and bills of lading, it seemed inconsistent for him to say he was in a hurry when it took him so long to get out of California with his load. The officer did not have a logbook entry telling him when defendant picked up the loads. The law only requires that drivers have a log for that day and the previous seven days, so these pick ups were out of that time period.

Defendant Edwards provided him with a temporary California license, and the officer ran a records check on the license. When the officer asked for his logbook, defendant Edwards went back to his truck with Parker to get the logbook. During that time, the officer discovered that Edwards' license was suspended. Because of that, he would not be able to drive the vehicle away, and defendant Parker was out of service. They were told the truck would have to stay at the scale house for ten hours. After review of the paper documents, the officer did the normal walk-around, and found that there was no fire extinguisher. Everything else looked to be in running order and

4

decent shape. One of the vehicles on the lower deck had a large cardboard box in it, which he believes was in the front seat. This was odd to him because hauled vehicles are usually empty. When he saw Edwards' log entries, he observed that he had not done a lot of driving. He had only one entry on the 29th. He told Parker a number of times that he needed to catch up his logbook. In the officer's opinion, he didn't act like it seemed important. When Officer Wilkins asked him why it took so long for him to leave California, he said he had some personal issues. He also told the officer that someone else had picked up the vehicles, but the bills of lading indicated that defendant Parker had picked up one. The officer told Parker that Edwards' license had been suspended and he couldn't drive the vehicle. He told him that he was out of service, and would have to catch up the logbook. He explained that this wasn't an important issue to him, but he went back to the truck to work on it. When he brought it back, the officer observed that he'd spent a lot of time in the sleeper berth, and the logbook for the 30th was completed through midnight, even though it was currently only about 8:30 p.m. It also indicated that on the 30th, he was in Amarillo, Texas at 5:30 p.m., which was inaccurate. Based on the fact that he did not have his logbook current, defendant Parker was out of service for ten hours. But, he did still have his logbook incorrect after trying to update it. On cross examination, the officer testified that when he left for the evening, he turned his report over to Officer Lee, his supervisor. When defendant drove his vehicle across the scale, there was not a problem with the weight limit. The reason why he initially approached the vehicle was because it was an older trailer for a car hauler, he didn't recognize the company, and he saw a high DOT number. His report doesn't reflect the number, but he stated that it was a carrier he wasn't familiar with. This is important because sometimes with new carriers, there are no records as far as inspections and whether they are maintaining their vehicles and credentials. . It was true

in this case that he stopped this carrier because he didn't recognize it, although this is not always true.

When he approached defendant Parker, the single state license he showed him was from 2005. He didn't recall having a conversation with him about this or asking him if he had a current license. The check they did would not have turned up information regarding whether there was a valid single state license. Officer Wilkins acknowledged that, according to a record provided by defendant, he did have a valid single state license on March 30, 2006. He decided to do the Level II inspection because defendant did not have a valid single state license and because there were missing entries in the logbook. Because of those omissions, he put him out of service for ten hours, based on the Commercial Vehicle Safety Administration operating regulations and an out-of-service criteria booklet. He has no discretion regarding the ten-hour out of service. If a driver has no entries for the present day or the past day, but does for the third day, current to midnight of that day, he would have been allowed to catch it up. In this case, he had to put him out of service, once he saw that the log wasn't complete beyond this period of time. Defendant Parker was told he could not leave until he brought his logbook current, although the officer wasn't sure what the authority was for this. . Officer Wilkins is not aware of a regulation that requires the driver to stay at the scale house during the ten-hour period. The officer admitted that defendant Parker had a hard time completing the logbook, and in one instance, he indicated that he was in the sleeper when he was actually with the officer. He began to have suspicions early on and told his supervisor that he thought the Highway Patrol should be called in. At the time he made this statement, he was suspicious because of the logbook, because the bills of lading showed he picked up the vehicles on an early date, yet he maintained he was in a hurry and under pressure to deliver the vehicles, and he

6

didn't seem to want to catch up his logbook. The reason to call in the troopers was to investigate possible criminal activity, about which he was suspicious at that time. He agreed that, at no time when he was there did anyone ever tell defendant Parker that his logbook was okay and he was free to leave. He had stopped him around 8:00 p.m., and the officer left about 9:30. Officer Wilkins stated that, as part of his job, he can check on compliance issues and keep his eyes open for illegal activity. For example, he agreed that asking about when he left California did not have anything to do with regulatory compliance issues.

Officer Wilkins admitted that he asked defendant Parker questions about possible criminal activity and that he was not free to leave, but no one read him his <u>Miranda</u> warnings. When he did the walk-around check, he just noticed the missing fire extinguisher and a large box in the Excursion. The lack of a fire extinguisher was not a citable offense, nor one he would have placed him out of service for. Regarding the large cardboard box, he explained that it just seemed out of place, and that made him suspicious. He's not aware of cars coming through with things in them. Because of the position of the vehicles, he could not see the whole box. The officer testified that at the very end of the evening before the left, defendant Parker finally came in with a completed logbook. He admitted that he had been cooperative. A criminal history check indicated that there were no warrants outstanding for his arrest. The officer agreed that he didn't see anything illegal when he conducted the walk-around. He barely spoke to defendant Edwards.

On cross examination by counsel for Edwards, the officer admitted that defendant was not cited for any violations as far as a ticket. The troopers were arriving as he prepared to leave.

On redirect examination, the officer testified that it is the driver's responsibility to have a single state license, and he did not present one in this case. Concerning the administrative violation,

7

he could have left if someone came to pick him up, even if he hadn't completed the logbook. He just was not free to leave the scale house with the tractor trailer. If someone came to pick up him, the officers would not have attempted to detain him solely because the logbook was not complete. Regarding when he left California, those questions were about the logbook as well as possible criminal activity.

On recross examination, the officer testified that there is a regulation that requires the driver to have a single state license. There have been instances where they have looked it up and found that there was a valid state license. If a trooper had been on the way, it would have been on another matter separate from the logbook issue, and he would have probably tried to keep defendant there to talk to a trooper.

The next witness for the government was Michael W. Lee, Missouri State Highway Patrol Commercial Motor Vehicle Officer. He was working on March 30, 2006, and came into contact with defendants on that day. Officer Wilkins advised him that he needed help with some logbook questions. He was the supervisor at the scale house. Officer Wilkins asked him to look at the co-driver's logbook, which was also behind. These are significant violations, which may result in a vehicle being placed out of service. He observed the following that caused him concern, per the regulations: Parker's were far enough behind to place him out of service; Edwards only had one entry on the 25th. Had someone showed up who could have driven the vehicle, he or she would have been allowed to drive it. If someone had shown up in a private vehicle, defendant Parker would have been allowed to leave. He was told he was out of service, but not told he could not leave. Before he could drive away, he had to show them a current logbook. He never heard Officer Wilkins tell him he wasn't free to leave. After Officer Wilkins saw the cardboard box, he told

8

Officer Lee that the Missouri State Highway Patrol should be called. Officer Lee also reviewed the logbooks, and saw the discrepancies. He saw that he'd picked up one vehicle on the 14th, the other two on the 20th, that he went home twice, and finally started on the 28th.

After Trooper Mitchell arrived, he started searching the vehicles, along with Trooper Moreland. Officer Lee walked around with them as they searched the cars on the trailer. The officers opened the Ford Excursion and found the cardboard boxes inside, containing some cans. He noticed a smell coming from the interior of the vehicle that he didn't recognize. They shut the vehicle and contacted the Newton County Sheriff's Department. A K-9 unit responded and indicated on the vehicle. Officer Lee went off duty at that time.

Upon cross examination by defendant Parker's attorney, the officer admitted that Officer Wilkins did a walk-around inspection at a time that defendant wasn't allowed to drive the vehicle. He was not aware of where defendant Parker was, but he thought he was outside to observe the walk around. Defendant Parker was told to get into the vehicle to operate the lights and told to open a compartment to look for a fire extinguisher. No illegal contraband was found in the cab. Then, defendant Parker was told to go inside and work on the logbook. Officer Wilkins told him that he'd seen two boxes, but not their contents. No one indicated that the boxes in the back seat of the Excursion were actually a violation of any regulations. This officer also walked around the truck and saw the boxes, about which he agreed the physical appearance itself wasn't unusual. He did not smell anything unusual at that time. They both questioned defendant Parker about discrepancies in the logbook; he was not under arrest and was not read his rights. Officer Lee agreed that defendant was told three times to catch up his logbook. The Highway Patrol were told about the logbooks and the boxes. The inspection report and the citation for the logbooks were completed

before the troopers arrived. At this point, defendants were told to go back to the truck to work on the logbooks. The logbook would have to be right before he could drive out of there; he did not think he said the logbook would have to be right before he was free to leave. He couldn't drive the vehicle, but Officer Lee denied that he told defendant Parker that he could not leave. The officer stated that people leave all the time in private vehicles or walk away. To his knowledge, no one told him that he could call someone to pick him up, and he knows he didn't. Once the troopers arrived, they talked to him about the paperwork, then walked around the vehicle, and then talked to defendant Parker. He didn't observe anyone read him his rights. Regarding a criminal history check, that's not usually done at a Level II inspection. He did not observe Trooper Mitchell ask for consent to search, and knows nothing about that. During the search, both defendants were outside and could observe the search. He actually assisted in the search of the Excursion, and was present when the boxes were opened and the cans were found. Trooper Mitchell opened the Excursion, found the cardboard boxes, and the cans. He noticed a smell that he did not recognize, coming from the interior of the Excursion. Troopers Mitchell and Moreland shut the vehicle after they saw the cans and noticed the smell, and called the K-9 officers. At that point, Officer Lee's shift was over.

On cross examination by counsel for defendant Edwards, the officer testified that he went off duty about midnight. Officer Wilkins was relieved by Officer Jones. When Trooper Mitchell arrived, he walked around the trailer after discussing the paperwork issues. The officer denied that defendant Edwards was handcuffed. If Officer Jones wrote that he was handcuffed at that time, that would be an incorrect statement. After Trooper Mitchell arrived, and talked to both defendants, he ran the criminal history check. He received the results before the dog alerted on the vehicle. If Officer Jones wrote otherwise, that is incorrect.

Case 3:06-cr-05018-MDH   Document 95   Filed 08/14/07   Page 10 of 24

On redirect, the officer testified that neither defendant asked for transportation help, but he would have provided it had they done so. It wasn't that defendant Edwards refused to fill out the logbooks, but just that he didn't seem to know how to do it.

The last witness for the government was Trooper Thomas O. Mitchell, of the Missouri State Highway Patrol. On the night in question, he was asked to assist at the scale house. He arrived about 10:00 p.m. Officers Wilkins and Lee contacted him, through his supervisor, about suspicious activity with a vehicle they'd stopped. This commonly happens. When he arrived, he was told about the logbooks, the fact that the vehicles on the trailer were overdue, and that the co-driver had a suspended or revoked driver's license. He thought he first talked to Officer Lee. He contacted defendant Edwards and then defendant Parker later. He asked Edwards the nature of his trip and about where the vehicles were going. He said they were personally owned vehicles, which had been picked up in California and were going to Ohio and Pennsylvania, but he could not be more specific about the delivery sites or the due dates. Defendant Parker stated that he was the owner of the tractor trailer, and that the vehicles were being taken to auctions in those states, although he was not specific about the exact destinations either. He also stated that he had picked up the 2000 Chevrolet pickup on the 14th, and the 2001 Ford Excursion and the 1995 Nissan Quest on the 20th. Trooper Mitchell asked defendant about the lateness of the delivery, and he said he had family problems. Defendant Parker advised how much he was being paid to deliver the vehicles, which was a total of $2,400.00. Trooper Mitchell stated that the Excursion was in the middle of the bottom rack of the trailer. He asked defendant Parker about the two large boxes that could be seen inside the Excursion. The officer had seen these, and didn't think this looked like an auction vehicle, which usually wouldn't have anything in it. Therefore, he thought this was suspicious. When he asked

11

defendant, he said he did not recall any knowledge of the boxes. The officer thought this was suspicious because if he'd loaded the Excursion, he'd have to crawl over the boxes to get into the vehicle. Defendant Parker had the keys to the vehicle, and he stated that he had picked it up, so the officer assumed he had loaded the vehicle onto the trailer.

Trooper Mitchell decided to run a criminal history check because "of the suspiciousness of the entire stop. . . ." [Tr. 104]. This included the fact that there were only three vehicles on a trailer that could have hauled several more; and they were making $2400 to go across country, when he didn't think the Nissan Quest would have been worth $700 to begin with. The criminal history check revealed that both defendants had criminal histories for drug violations, and he thought there were assaults and a weapons' violation. Defendant Edwards had a felony probation violation warrant from California. After being confronted with the criminal history checks, defendants admitted that they'd previously been arrested, but denied ever having been arrested for drug-related offenses. The criminal history checks indicated that "they had criminal histories for transporting, possession, manufacture of a controlled substance," according to Trooper Mitchell. [Tr. 105]. Because of the outstanding warrant, he handcuffed defendant Edwards and placed him under arrest.

After this, Trooper Mitchell asked defendant Parker for "consent to search the vehicle, the truck, trailer, and its contents." [Tr. 106]. He did not limit the search to just one vehicle. Defendant Parker gave verbal consent to search the vehicle and its contents. Defendant Parker was inside the scale house and outside during the time of the search. He never told defendant Parker that he wasn't free to leave. The officer testified that he did not do anything to put defendant under duress, nor did he act physically violent with him. Defendant Parker appeared to understand the request for consent to search. He provided the keys for the three vehicles on the car hauler. In the Excursion, with the

12

key provided by defendant Parker, the officer unlocked the back hatch, and saw the two boxes. He pulled out the first box, and noticed a very strong chemical odor. That was apparent as soon as he opened the doors. He set the box down and pulled out several brass cans, which were sealed with labels on them. The other box in the back seat also contained several sealed one-gallon cans. The labels were very generic looking, and said "Unique Oil," with a date of March 25th, an address from Nevada, and a label indicating that they were to be shipped to Philadelphia, Pennsylvania. They checked the address in Nevada, which was non-existent. The zip codes on the cans did not match a Philadelphia address. There were a total of 40 cans; he picked one up and shook it. It did not feel like oil, but more like water. He contacted Sergeant Dan Banasik, an officer with the Division of Drug and Crime Control ["DDCC"], who told him to open the can. He did so, and observed a clear liquid, with a very strong chemical odor. After he found the cans with the label dates of March 25th on them, he became more suspicious, given that defendant Parker had stated he picked the cars up on the 20th. He asked defendant Parker about the inconsistency of the dates. He replied that he had signed for Excursion on the 20th, but picked it up at a later date. Defendant Edwards' story did not change.

The officer then called the Newton County Sheriff's Department, and their K-9 unit. The dog tried to get away from the Excursion, which one of the officers said a dog would do in response to a strong chemical odor. While inside the cab of the truck, the dog alerted towards the Nissan Van, which was toward the header of the trailer. The officer had searched the Chevy pickup and found nothing, but when he looked inside the van, he noticed that the dash appeared to have been tampered with, particularly the steering column and the glove compartment. He looked inside the glove compartment, which was ajar, pulled out the reservoir that fits inside, and found a void behind

13

the dash with approximately 12 kilos of what appeared to be cocaine. He thinks the search was over by 12:30 a.m. He believed that after the search, defendants were interviewed by Miles Park, and were arrested by Corporal Moreland.

On cross examination by defendant Parker's counsel, when Trooper Mitchell arrived, defendant Parker was inside the scale house. He asked him some questions, probably about where he was from and where he was going, and just general questions about the nature of his trip. He was doing this to try to determine if this was a suspicious trip, and to investigate if there was the possibility of criminal activity. He did not read him his Miranda rights, nor did he tell him that he didn't have to talk to the officer or that he could leave. Some of defendant Parker's answers made him suspicious because they weren't the same as what defendant Edwards had to say. Neither one of them seemed to know exactly where they were going, and they didn't agree about whether the vehicles were privately owned or for auction. His suspicions were also aroused because defendant Edwards did not have a valid driver's license. He talked to defendant Edwards outside, and then did the criminal history check because of suspicious activity. Specifically, regarding the officer's suspicions, he was bothered because their stories didn't match; the hauler could have carried eight or nine cars, rather than three; and the I-44 corridor is an area of high drug activity. He never told defendant Parker he could leave, and he talked to him inside and outside the scale house. When he asked for consent, he's not sure where exactly defendant Parker was. He said "I'd like permission to search the vehicle and its contents." [Tr. 121]. Trooper Mitchell then testified that he asked for consent to search "for anything illegal." [Id.]. He didn't remember if he'd been told that Parker was being held on a regulatory violation. Trooper Mitchell admitted that he did not tell defendant that he was now conducting a criminal investigation, or otherwise explain that they had switched gears.

14

When he asked to search the tractor trailer and its contents for anything illegal, he did not recall whether he specified drugs. He did not explain to defendant Parker that he considered the contents to include the individual vehicles. He thought Parker was inside and outside the scale house during the search; at some point was outside smoking a cigarette. It's fair to say that he may not have seen them searching the individual vehicles. Prior to the dog arriving, they had taken out the boxes, opened them, and seen the cans, but had not opened the cans. He was told the dog alerted because he turned away, and his trainer said that was an indicator of an overwhelming odor. He agreed that he was there with defendant for at least two hours. Prior to getting the keys from defendant and asking for his consent to search, he had not noticed anything unusual about the boxes, other than the fact that defendant had told him they were auction vehicles, and it would have been unusual for boxes to be inside. He did not ask if all the vehicles were going to an auction. None of the vehicles were registered to defendants. He talked to him initially when he first got there; later he talked about the vehicles after he'd talked to defendant Edwards; and then about the discrepancy regarding the date on the cans. He talked to him possibly three times, and never advised him of his rights. He doesn't know if anyone told Parker to stay inside during the search. Defendant never made any incriminating statements about the vehicles or what was contained within them.

On cross examination by counsel for defendant Edwards, Trooper Mitchell testified that he contacted defendant Edwards in the tractor trailer. He questioned him about the vehicles, where they had been picked up, and where they were going. He never told him he was free to leave. His next contact with defendant was when he placed him under arrest for the outstanding warrant before the search began. He did not read defendant his rights. During the search, defendant Edwards was sitting on the curb, close to the vehicle, and there was always some officer watching him.

Case 3:06-cr-05018-MDH   Document 95   Filed 08/14/07   Page 15 of 24

On redirect, Trooper Mitchell testified that regarding the stop of the vehicle itself, a commercial vehicle must stop at a weigh station under Missouri law when it enters the state, to have the weight checked. He stated that in addition to requesting consent from defendant Parker to conduct the search, he also asked defendant for the keys to the vehicles. Defendant Parker made no statements or disclaimers when he gave the officer the keys regarding the consent or the extent of the consent.

The law is clear that probable cause is not needed to stop a commercial motor vehicle for routine inspection. <u>United States v. Mendoza-Gonzalez,</u> 363 F.3d 788, 794 (8th Cir. 2004). The Supreme Court has held that "a warrantless search of property in certain closely regulated industries is constitutional if the rules governing the search offer an adequate substitute for the Fourth Amendment warrant requirement." <u>Id.</u> at 793-94.

In this case, a full review of the testimony adduced at the suppression hearing indicates that the vehicle in question was a commercial motor vehicle, and that the officers were acting within their authority and discretion when they stopped the vehicle at the weigh station and began conducting a routine commercial vehicle inspection. Although they noticed an unfamiliar name on the truck, they had the authority to stop it regardless as part of their duties as commercial motor vehicle inspectors. There is no question that checking the vehicle under the commercial vehicle laws was part of a valid traffic stop. Once a routine traffic stop occurs, the investigating officer is entitled to detain an individual and conduct an investigation reasonably related in scope to the circumstances that justified the initial stop. <u>Terry v. Ohio,</u> 392 U.S. 1 (1968); <u>United States v. Ehrmann,</u> 421 F.3d 774, 780 (8th Cir. 2005). Further, law enforcement officers are entitled to stop and briefly detain an individual for investigative purposes if there is reasonable suspicion that

16

criminal activity may be afoot. United States v. Hill, 91 F.3d 1064, 1069 (8th Cir. 1996). A police officer may also run a computer check to establish, among other things, whether there are outstanding warrants for any passengers in the car. See United States v. McManus, 70 F.3d 990, 993 (8th Cir. 1995); United States v. Johnson, 58 F.3d 356, 357 (8th Cir. 1995). Additionally, if the responses provided give rise to suspicions unrelated to the traffic offense, the officer's inquiry may be broadened. Id. at 357. This includes asking the driver for his license and registration, requesting him to sit in the patrol car, and inquiring as to the driver's destination and purpose. Id. If a defendant is detained incident to a traffic stop, the officer does not need reasonable suspicion to continue the detention until the purpose of the traffic stop has been completed. See United States v. Jones, 269 F.3d 919, 924-25 (8th Cir.2001). The Eighth Circuit has clearly held that, even without reasonable suspicion, if an encounter after a traffic stop's completion is consensual, a law enforcement officer may ask questions unrelated to the traffic stop and request consent to search the vehicle. United States v. Santos-Garcia, 313 F.3d 1073, 1078 (8th Cir. 2002).

Having made the valid stop in this case, the officers were acting within their authority in conducting the Level I inspection. This includes checking the license, logbooks, where the vehicle has been and where it is going, medical cards, fuel level, and licenses. After problems were discovered with the logbooks and defendant Parker's single state license, as well as defendant Edward's driver's license, they decided to conduct a Level II inspection, which included a walk-around and a visual inspection of the vehicles. They were authorized to do this under both on federal and state law. Based on the compliance problems and then the fact that the cardboard boxes were in the Excursion, Officer Wilkins found these to be suggestive of suspicious activity in connection with the load. Accordingly, he called Missouri State Highway Patrol Officers to the

scene because those officers had the authority to investigate more thoroughly and to request a consent to search the vehicle if that were deemed necessary. All the officers testified that they had the same concerns regarding the cardboard boxes and the fact that the trip had been delayed.

When considering the totality of the circumstances, the Court finds, in summary, that the officers' testimony about the discrepancies in the logbooks, the inconsistencies regarding the type of vehicles being carried and where they were going, the information on defendants' criminal histories, including drug-related arrests, and the suspicious nature of the cardboard boxes being hauled in a vehicle that was going to auction, about which defendant Parker denied knowledge, created reasonable suspicion to believe that further investigation of criminal activity was appropriate. In terms of whether defendant Parker voluntarily consented to the search, the government bears the burden of proving, by a preponderance of the evidence, that defendant's consent was voluntary. United States v. Willie, 462 F.3d 892, 896 (8th Cir. 2006). Regarding whether defendant's consent was voluntary, the Court must examine a number of factors, including "[s]ome relat[ing] to the characteristics and behavior of the defendant, . . .[o]thers relat[ing] to the environment surrounding the defendant at the time he gave his consent, . . . [and s]till others relat[ing] to the interaction between police and the defendant in this encounter. Id. at 896.

In the instant case, the evidence indicates that defendant was apparently able to communicate effectively, he appeared to be of average intelligence, and there was no indication that he was intoxicated or impaired. Taken together, his relevant characteristics do not suggest that he was unusually vulnerable to police coercion. Additionally, the environment of the encounter was not inherently coercive. Although defendants contend that the officers obtained consent to search only after an unlawful detention, and that the consent was therefore not voluntary, this argument is

18

without merit. For reasons otherwise stated in the Report and Recommendation, the Court finds that defendants were not illegally detained. The discussion took place in and around a weigh station. It appeared that the interaction with defendant was straightforward, and that there were no intimidating gestures or statements, duress or deceit. It is clear that Trooper Mitchell communicated a request for defendant's consent to search the vehicle and its contents, for anything illegal. Although defendant argues that he did not understand the scope of the search that the officer was suggesting, there is nothing to indicate that defendant expressed any doubts or made his objections known at the time of the request. Rather, he gave verbal consent, plus he handed over the keys to the vehicles. When Trooper Mitchell requested defendant Parker's consent, there was no evidence that he did not voluntarily provide that consent. Further, according to the officer's testimony, defendant did not object to the search or attempt to withdraw his consent. He testified that defendant was outside during at least part of the search, and there is no indication that he attempted to halt the search. Therefore, under the totality of the circumstances, the Court finds that defendant's consent was voluntarily given.

Regarding whether Trooper Mitchell's search exceeded the scope of defendant's consent, defendant contends that his consent was not so broad as to give the officers the authority to search the entire tractor trailer, the vehicles being hauled, and the contents of those vehicles. The scope of consent to search is generally determined by "what . . . the typical reasonable person [would] have understood by the exchange between the officer and the suspect[.]" Florida v. Jimeno, 500 U.S. 248, 251 (1991). In this circuit, it has been recognized that "the typical reasonable person" would understand a suspect's general consent to search a vehicle for drugs to include consent to open unlocked containers within the vehicle, id., access apparently false compartments, United States v.

19

Ferrer-Montoya, 483 F.3d 565, 568-69 (8th Cir. 2007), and "search any part of the truck where [drugs] might be stored." United States v. Siwek, 453 F.3d 1079, 1085 (8th Cir. 2006).

Based on a full review of the evidence, the Court finds that the exchange between the officer and defendant left no doubt that defendant understood the scope of the search. This is basically established by the fact that he provided keys to the vehicles being hauled. The record indicates, moreover, that defendant was in a position where he could have withdrawn his consent or limited its scope, as the officers testified that he was inside and outside during the time the search was taking place. If he had wished to withdraw his consent, there is no evidence that he was unable to do so. Accordingly, the Court finds that this argument is without merit. Under the totality of the circumstances, the Court concludes that defendant understood the officer's communication as a request for consent to search the tractor trailer and all the vehicles, and that the search did not exceed that scope.

Defendants argue that the officers detained them for six hours, which was beyond the scope of their authority and was without reasonable suspicion or probable cause. The initial detention occurred for some period of time for a routine commercial vehicle stop, which went from a Level I to Level II inspection because of discrepancies delineated herein. The fact that defendants had been at the weigh station since 8:00 that evening had to do, initially, with the commercial vehicle stop and inspections. Any additional delay during that time period occurred because of the problems with the logbooks, and the fact that it took multiple attempts, particularly by defendant Parker, to get his logbook in compliance. Additionally, there was nothing about the length of time that elapsed after Trooper Mitchell arrived on the scene, which would support defendants' contention that the detention was so lengthy as to have violated their Fourth Amendment rights.

Case 3:06-cr-05018-MDH   Document 95   Filed 08/14/07   Page 20 of 24

Once the officer talked to defendants and became more suspicious of criminal activity, he then obtained consent and searched the vehicles and their contents. Once the boxes were removed, the cans inside further caused concern, based on the inconsistency regarding the dates, and the discrepancies in the information on the labels. The officer then contacted Sergeant Dan Banasik, with DDCC, for information on how to proceed. He advised Trooper Wilkins to open a can; having done so, a clear liquid with a strong chemical odor was observed. Then, a K-9 unit was called in. Despite the fact that approximately 2 ½ hours elapsed before the search was completed and both defendants were under arrest, the Court finds that that length of time was not unreasonable under the circumstances of this case.

Turning next of the issue of whether there was a Miranda violation in this case, defendants contend that they were interrogated while in custody without being read their rights, and ask that the statements and evidence be suppressed. The government maintains they were not in custody at the time they were initially interviewed by Officers Wilkins and Lee.

Having carefully reviewed the record in this case, the Court finds that, based on the totality of the circumstances, there is no indication from the evidence that any statements made by defendants were the product of illegal coercion or duress, or that they suffered a Miranda violation. Defendants must be advised of their Miranda rights when he or she is both in custody and is interrogated. Miranda v. Arizona, 384 U.S. 436 (1966). A traffic stop is not considered sufficiently coercive in nature to require that persons who are temporarily detained during a traffic stop be considered "in custody" for the purposes of Miranda. Berkemer v.. McCarty, 468 U.S. 420, 439-40 (1984); United States v. Pelayo-Ruelas, 345 F.3d 589, 592 (8th Cir.2003). In addition to the requirement of custody, the defendant must also be interrogated for Miranda to apply. Miranda, 384

Case 3:06-cr-05018-MDH   Document 95   Filed 08/14/07   Page 21 of 24

U.S. at 444. Interrogation is "express questioning or its functional equivalent." <u>Rhode Island v.</u> <u>Innis</u>, 446 U.S. 291, 300-01 (1980). <u>United States v. Griffin</u>, 922 F.2d 1343, 1347 (8th Cir.1990).

An individual need not be arrested formally to be deemed to be in custody, and that determination is made under an examination of the totality of the circumstances. <u>Id.</u> at 1347. In determining whether a suspect is "in custody" at a particular time, the Court must examine the extent of the physical or psychological restraints placed on the suspect during interrogation in light of whether a "reasonable person in the suspect's position would have understood his situation" to be one of custody. If [the defendant] believed his freedom of action had been curtailed to a degree associated with formal arrest, and that belief was reasonable from an objective viewpoint, then [the defendant] was being held in custody during the interrogation. <u>Id.</u> [citations omitted].

In the instant case, regarding whether defendants were in custody, the testimony adduced at the hearing establishes that defendants' freedom of movement was basically unrestrained during the questioning. At times, they were in the tractor trailer, and/or inside or outside the scale house. There is no indication whatsoever that any strong arm tactics or deceptive actions were employed during the questioning. On the basis of the logbook entries that were incorrect, defendant Parker was placed on a ten-hour hold. He was instructed on several occasions to complete his logbook, under the regulatory scheme applicable to commercial vehicles. Further checking indicated that defendant Edwards did not have a valid driver's license, and he therefore could not drive as a result. The officers testified that although defendant Parker could not drive the tractor trailer, and defendant Edwards could not drive at all, neither of them were barred from leaving the scale house. The testimony also established that during the time of the questioning and the consensual search that

22

occurred, both men were free to go into and outside of the scale house. Their freedom of movement was not so restricted as to conclude that they were in custody for purposes of <u>Miranda.</u> Defendant Parker was not arrested until after the K-9 unit had arrived and alerted to the vehicles, and drugs were found. Additionally, defendant Edwards was not placed under arrest until after a probation violation warrant was discovered.

Regarding whether defendants were being interrogated, the questioning that occurred with Officers Wilkins and Lee was within their discretion to ask under state and federal regulations governing commercial vehicles in Missouri, and was also within the parameters of <u>Terry</u>. On the basis of discrepancies in the logbooks, in the type of vehicles being hauled, and in the uncertainty regarding the exact destination and time of delivery for the vehicles, the officers engaging in the initial questioning became suspicious about the nature of defendants' trip. Once the Highway Patrol arrived, the investigation broadened and a criminal history check revealed that both men had prior arrests for drug-related activities. However, an officer lawfully may exceed the original traffic law purpose of the stop by engaging in other investigative activities, such as questioning or asking permission to search, where these further investigative activities are supported by a reasonable suspicion of wrongdoing based upon articulable facts under <u>Terry</u>; <u>United States v. Sokolow</u>, 490 U.S. 1, 7 (1989); <u>United States v. Pulliam</u>, 265 F.3d 736, 740 (8th Cir.2001). After careful review, the Court is convinced that the questions asked of defendants were legally within the purview of a <u>Terry</u> stop, and that defendants were neither in custody nor interrogated. Accordingly, their <u>Miranda</u> rights were not violated.

Based on a full review of the evidence in this case, the Court finds that the officers acted within their legal authority; that the traffic stop and questioning were constitutionally valid; that the

Case 3:06-cr-05018-MDH   Document 95   Filed 08/14/07   Page 23 of 24

officers had reasonable suspicion to request consent to search; that defendants were not illegally detained; that the search was consensual; that defendants' <u>Miranda</u> rights were not violated; and that the arrests of defendants were based on probable cause. Therefore, it is apparent that the Fourth Amendment was not violated. It must be recommended, accordingly, that defendants' motion to suppress evidence be denied.

For the foregoing reasons, it is, pursuant to the governing law and in accordance with Local Rule 72.1 of the United States District Court for the Western District of Missouri,

RECOMMENDED that defendants' Motion to Suppress Evidence should be denied.

/s/ James C. England
JAMES C. ENGLAND, CHIEF
United States Magistrate

Date: 8/14/07